IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| **TRANSAMERICA LIFE INSURANCE COMPANY,** | : : : | |
| **Plaintiff,** | : : | |
| v. | : : | Case No. 5:19-cv-415-CHW |
| **BERNO I. PETTERSSON JR. and MARTIE JANE ALBERT,** | : : : : | |
| **Defendants.** | : : | |

### ORDER ON MOTION FOR SUMMARY JUDGMENT

This interpleader action requires the Court to determine which of two claimants is the proper beneficiary of a life insurance policy obtained by the deceased Norma Jean Pettersson (Mrs. Pettersson). The two claimants are Mrs. Pettersson's husband, Berno Pettersson (Mr. Pettersson) and Martie Jane Albert (Ms. Albert), who is the sister of Mrs. Pettersson's agent under a power of attorney. Shortly before Mrs. Pettersson's death, the agent, Melodie S. Hughley (Ms. Hughley), filed a request to remove Mr. Pettersson as beneficiary of the policy and to name Ms. Albert as beneficiary instead. When Mr. Pettersson disputed the validity of this change, the insurer, TransAmerica Premier Life Insurance Company (TransAmerica) filed this interpleader action.

Before the court is a motion for summary judgment filed by Ms. Albert. (Doc. 24). As set forth below, the record indicates that there are genuine issues of material fact regarding (1) breach of fiduciary duty by the agent with power of attorney in naming the agent's sister as beneficiary of Mrs. Pettersson's life insurance policy and (2) undue influence in obtaining the power of attorney over the affairs of Mrs. Pettersson. Because these issues of fact will require resolution at trial, Ms. Albert's motion is **DENIED**.

1

## JURISDICTION

The Court has subject matter jurisdiction over this interpleader action under 28 U.S.C. § 1335(a), as the amount in dispute is in excess of $500, and the two claimants to the funds are of diverse citizenship. TransAmerica has deposited $104,321.10, the value of the policy in dispute with accrued interest, into the registry of the Court. Claimant Albert is a citizen of Tennessee, and claimant Pettersson is a citizen of Georgia. As the Court's jurisdiction is based on diversity of citizenship, the substantive law of the state of Georgia governs matters related to the construction of the policy and the validity of the power of attorney.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if the movant, here claimant Albert, "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of informing the Court of the basis for its motion, and of citing "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that support summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). In resolving motions for summary judgment, the Court must view the evidence in the light most favorable to the non-movant, here claimant Pettersson. *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014).

This Court's Local Rule 56 additionally requires that a "respondent to a motion for summary judgment shall attach to the response a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine dispute to be tried." M.D. Ga. Local Rule 56, ¶ 2. The Rule also requires that "[r]esponse shall be made to each of the movant's numbered material facts." (*Id.*).

Both parties in this case are proceeding *pro se*, and neither party has fully complied with the requirements of Rule 56 and Local Rule 56. It does not appear that either party attempted to engage in discovery. Claimant Albert's motion for summary judgment consists of a numbered statement of facts with citations to various submitted exhibits, along with a conclusory argument of law. Claimant Pettersson's summary judgment response is largely incoherent and fails to address many of claimant Albert's separately enumerated material facts. Much of the relevant evidence in the record is found in the documents submitted by the plaintiff in interpleader, TransAmerica.

In light of both parties' *pro se* status, the Court has taken pains to review the entire record liberally for both material facts and legal arguments. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally constructed") (internal quotations omitted). The evidence in the record is construed in the light most favorable to the non-moving party, Mr. Pettersson, and is set forth below.

## RELEVANT FACTS

This interpleader action concerns a $100,000 life insurance policy issued by Transamerica Life Insurance Company and held by Norma Jean Pettersson, who died on May 5, 2019, at the age of 77. (Doc. 1-30, p. 14) (death certificate). The policy, issued on March 17, 2011 (Doc. 1-1, p. 2) (insurance policy), originally named the decedent's husband of 43 years, Berno I. Pettersson Jr., as the sole primary beneficiary (Doc. 1-1, p. 16) and named Stephenie P. Barrett, Mr. Pettersson's sister, as the sole contingent beneficiary. (Doc. 1-1, p. 20). Mr. Pettersson is one of the two claimant–parties before the court.

The other claimant party is Martie Jane Albert. Ms. Albert lives in Bristol, Tennessee, and the record suggests[1] that she was at most an acquaintance of the Petterssons. (Doc. 35, p. 5; Doc. 1-19, pp. 2-3; Doc. 1-20, p. 2; Doc. 12-10, p. 2). She is also the sister of Melodie S. Hughley, who obtained a power of attorney over Mrs. Pettersson's affairs in June 2018 and used that power of attorney to change the beneficiary of Mrs. Pettersson's life insurance policy from Mrs. Petterson's husband to Ms. Albert.

Ms. Hughley characterizes herself as a friend of the Pettersson family and former employee of Mr. Petterson. In a 24-page sworn statement attached to Ms. Albert's motion for summary judgment, Ms. Hughley states that she and her husband, Jimmy Hughley, originally met the Petterssons in church 40 years ago. (Doc 12-11, p. 2). She further states that she began working for Mr. Pettersson as a clerical assistant or lab assistant[2] in 2003 and that she worked for him without compensation between 2004 and 2016. (Doc. 12-11, p. 3).

In the summer of 2018, both Mr. Pettersson and Mrs. Pettersson were hospitalized. The record indicates that Mrs. Pettersson was admitted to a nursing home, Fort Valley Health and Rehab, in December 2017, and remained there until her death. (Doc. 12-11, p. 6). The nature of Mrs. Pettersson's health condition is not clear from the record, although it appears to be related to kidney failure. (Doc. 12-2, p. 2). The record indicates that Mrs. Petterson was bed-ridden and required dialysis. (*Id.*; Doc. 12-11, p. 15).

Mr. Petterson was also hospitalized between March and June 2018. On March 23, 2018, Jimmy Hughley found Mr. Petterson at his home "on the floor in the hallway, lying in urine and

---

[1] Review of this motion is complicated by the fact that both parties are proceeding *pro se*, and neither has submitted any coherent statement of facts or admissible evidence. The information submitted by the parties consists largely of innuendo, invective, and irrelevancies.
[2] The record indicates that Mr. Pettersson was an insurance agent and was also engaged in some form of chemical research.

4

feces, half-dressed, deliriously saying he was trying to get to the room and fell." (Doc. 12-11, p. 6). The Hughleys took Mr. Pettersson to Perry Hospital, where he remained several days before checking himself out against medical advice. (Doc. 12-11, p. 7). Shortly afterwards, Jimmy Hughley took Mr. Pettersson to Peach County Hospital, but Mr. Pettersson again checked himself out against medical advice on April 7, 2018. (Doc. 12-11, p. 8). Finally, at some time in April 2018, Mr. Pettersson was admitted to Coliseum Hospital in Macon, where he remained until June 14, 2018. (Doc. 12-11, pp. 8, 16). Again, the record does not state the exact nature of the health concerns that led to Mr. Pettersson's hospitalizations. Ms. Hughley seems to suggest that Mr. Pettersson's condition was primarily mental, that he was diagnosed with "severe dementia and delusions of grandeur." (Doc. 12-11, p. 11). Mr. Hughley in his response states that his diagnosis was "bacterial encephalitis" and that during his hospitalization he "was very sick running a high fever of 103.5 [degrees]", that he was "heavily sedated," that he "lost close to 50 lbs.", and that he had "4 surgeries on my jaw too removed [*sic*] the pus pocket caused by the infection." (Doc. 35, p. 4). Mr. Pettersson denies Ms. Hughley's characterization that he is "demented" or mentally incompetent.

While Mr. Pettersson was hospitalized, Ms. Hughley appears to have taken on herself the role of caretaker and guardian for both of the Petterssons. Ms. Hughley and her husband went to the nursing home to notify Mrs. Pettersson that Mr. Pettersson was in the hospital. Ms. Hughley also communicated with a personal friend of Mr. Pettersson, Dr. Larry Adams. Ms. Hughley then went to the Petterssons' home, where she had a key, and cleaned the house, did laundry, and went through the mail.

In April 2018, Ms. Hughley obtained a cellular telephone for Mrs. Pettersson, but attempted to limit Mrs. Pettersson's communications with her husband. As Ms. Hughley explains:

5

> I went to Verizon, where I have my plan and I bought a simple flip phone on a plan, and added the line to my plan. I presented Jean with the phone, and at first, she thought Berno had sent it. I cleared that up immediately and told her it was my phone. She could call me if she needed some coffee after dialysis, or if she just wanted to talk. I told her she could call Berno, but I blocked him from calling her. That was to give HER control over when she wanted to talk to Berno, like while she was eating or getting ready to go to dialysis or to sleep. She would use the phone to call Berno about 2-3 times a day, and then the calls became extreme. The minutes were over an hour, and at the time she was just getting back from dialysis and I knew she was worn out. I received complaints from the staff that Berno would call all the time and keep Ms. Pettersson on the phone while she was supposed to be eating.

(Doc. 12-11, p. 10)

Ms. Hughley later suspended service on the flip phone she had given to Mrs. Pettersson, "so that she could have rest and eat without interference from Berno." (Doc. 12-11, pp. 18-19). After suspending service, Ms. Hughley would make arrangements for Mrs. Pettersson to speak with her younger brother, James Burgess, on Ms. Hughley's personal telephone. *Id.*

While Mr. Pettersson was at Coliseum Hospital, Ms. Hughley attempted to obtain a power of attorney over Mr. Pettersson's affairs. On May 16, 2018, the hospital's attorney notified Ms. Hughley that a power of attorney would not be possible due to Mr. Pettersson's mental state, offering the opinion that "a guardianship is going to be the only potential route, given the hospital physicians' opinion that Mr. Pettersson cannot make decisions for himself." (Doc. 1-12, p. 5). Ms. Hughley then sought to become Mr. Pettersson's guardian:

> On May 7, 2018, at the Coliseum Hospital, I met Gloria Wiggins (now Hunter), who is Bibb County's Adult Protective Services agent. She informed me that the hospital was searching for a close friend to become Berno's Guardian and Conservator, as his diagnosis was 'severe dementia and delusions of grandeur,' and

> he states he had no family members. As we were Berno's closest friends, she suggested that one of us become Guardian and the other become Conservator, at least until he was placed into a facility.

(Doc. 12-11, p. 11)

Ms. Hughley explained to Ms. Wiggins that Mr. Pettersson had a sister, Stephanie, in Jacksonville, but that his sister "had no desire to be involved with him." (*Id.*).

In her sworn statement, Ms. Hughley states that Mrs. Pettersson then contacted her in May 2018, seeking help in applying for Medicaid assistance. (*Id.*). Ms. Hughley states that she initially had difficulty communicating with DHS and Mrs. Pettersson's bank on Mrs. Pettersson's behalf.

> [Mrs. Petterson] then appealed to us to become her Power of Attorney. We refused at first, knowing Berno's stance on control of his wife's personal affairs, but after asking us on the following two visits again, we agreed. ... So after Jimmy and I discussed it in detail, I visited a local attorney and was given a form for Jean to sign. I went the next day and got her signature, had it witnessed, and took it to the attorney for filing. This was on May 24, 2018.

(Doc. 12-11, p. 12)

On June 5, 2018, Ms. Hughley visited a second attorney, Jennifer Haskins, in Macon for further advice about managing the Petterssons' affairs.

> I explained to Jennifer that the Petterssons were friends, had no children, Jean was in a nursing home with kidney failure, Berno was in Coliseum Hospital diagnosed with severe dementia and delusions of grandeur, he had a sister in Jacksonville who was not willing to be involved, Jean had 2 brothers in South Georgia, who were not able to assist because of distance, and we are here. No one knows them as well as we do, having worked side by side with them since 2003. What were our options? Jean had signed POA to me, with Jimmy as contingent, but with Berno's mental state he couldn't grant POA, and we didn't know anything about how to become Guardian or Conservator.

7

(Doc. 12-11, 14)

Ms. Haskins examined the power of attorney form Ms. Hughley had used and determined that the form was out of date. Ms. Hughley then arranged an appointment to have Ms. Haskins meet with Ms. Pettersson at the nursing home on June 11, 2018, to execute a new form. (Doc. 12-11, p. 15).

On June 11, 2018, with the assistance of Ms. Haskins, Mrs. Pettersson executed a Financial Power of Attorney and a Georgia Advance Directive for Health Care, naming Melodie S. Hughley as her attorney-in-fact and health care agent. (Doc. 12-22). Among other provisions, the Financial Power of Attorney authorizes the agent

> To exercise or perform an act, power, duty, right, or obligation in regard to any contract of life, accident, health, disability, liability, or other type of insurance or any combination of insurance; and to procure new or additional contracts of insurance for me and to designate the beneficiary of same; **provided, however, that my Agent cannot designate himself or herself as beneficiary of any such insurance contracts**.

(Doc. 12-22, p. 4 (emphasis added))

The Acceptance of Appointment, signed by Ms. Hughley, states, "I owe a duty of loyalty and good faith to the Principal, and must use the powers granted to me only for the benefit of the Principal." (Doc. 12-22, p. 8). The Power of Attorney and Advance Directive document was filed with the Clerk of the Superior Court of Houston County on the same day, June 11, 2018. (Doc. 12-22, p. 1).

Three days after signing the Power of Attorney, Ms. Hughley began to correspond with TransAmerica about Mrs. Pettersson's life insurance policy. TransAmerica's documents indicate that Ms. Hughley sent a fax on June 14, 2018, notifying TransAmerica that she had obtained the

power of attorney for Mrs. Pettersson. (Doc. 1-2).[3] On July 3, 2018, Ms. Hughley sent another fax to TransAmerica requesting a change of address and a "form to change beneficiary choice." (Doc. 1-4). In a third fax, dated August 14, 2018, Ms. Hughley again notified TransAmerica of the change of address and requested a change of beneficiary form. (Doc. 1-5).

Shortly after Ms. Hughley first contacted TransAmerica, on June 20, 2018, TransAmerica recorded a telephone call from Mr. Pettersson contesting the power of attorney. (Doc. 1-3). According to TransAmerica's records, Mr. Pettersson stated that "the person listed on the poa – Melodie Hughley – not a valid a poa." *Id.* TransAmerica's records indicate that Mr. Pettersson called again on June 25, 2018, to notify them that he had made a report to the Houston County Sheriff's Office[4] and to state that "he is very concerned about the policy being fraudulently surrendered." *Id.*

After TransAmerica confirmed on September 17, 2018, that it had received the change of address request and revised its records to reflect Ms. Hughley as holder of the power of attorney (Doc. 1-7), Ms. Hughley sent another fax, on September 25, 2018, warning TransAmerica not to accept communications from Mr. Pettersson.

> **In consideration of the fact that I am the POA of record of Ms. Pettersson, I am notifying you that Mr. Pettersson (even as an insurance agent) has not been authorized to make any changes to the above policy. Any request for changes will be made directly to you by fax, not electronically**, as Mr. Pettersson has been diagnosed with mental disorder and may attempt to make himself the irrevocable

---

[3] The document submitted by TransAmerica is in fact a fax cover sheet from Ms. Hughley dated September 3, 2018, that references a prior fax sent on June 14, 2018.
[4] The record indicates that Mr. Pettersson made a report to the Houston County Sheriff's Office on June 14, 2018, stating that when he returned home from the hospital, he found missing a firearm, a wallet, two laptop computers, two tablet computers, and various prescription medications. (Doc. 1-7). Ms. Hughley has admitted that she entered the Pettersson's residence on May 25, 2018, and took possession of Mr. Pettersson's "laptops and personal papers, along with confidential formula notebooks, and put them in a box to keep safe in our possession." (Doc. 12-11, p. 12). She also states that she "hid" the firearm somewhere in Mr. Pettersson's house, but has not told him where she placed it. (*Id.*, at 13). The record does not indicate that Ms. Hughley ever returned this property to Mr. Pettersson.

beneficiary by means of an electronic submission, which would be fraud, as Ms. Pettersson is presently in a nursing home and does not have access to a computer.

(Doc. 1-8, emphasis in original)

Ms. Hughley subsequently submitted two change of beneficiary requests to TransAmerica. On December 29, 2018, Ms. Hughley sent a fax with a change request naming Martie Jane Albert as 70% beneficiary and Stephenie P. Barrett as 30% beneficiary. (Doc. 1-9, p. 2). In a cover letter sent with the form, Ms. Hughley also requested that TransAmerica not notify Mr. Pettersson of the change:

> I am also requesting that notification of this change NOT be sent to the agent who is listed, BERNO I PETTERSSON, JR. His office is vacant, phone is disconnected and out of service, and he has been diagnosed with mental illness; not to mention, he is the spouse and previous beneficiary. I do not wish him to be notified of any changes.

(Doc. 1-9, p. 3)

Then on February 2, 2019, Ms. Hughley faxed a second change of beneficiary form, this time naming claimant Martie Jane Albert as the sole irrevocable beneficiary, with Sarah Jane Hughley as contingent beneficiary. (Doc. 1-11). After receiving the request, TransAmerica notified Ms. Hughley that it was unable to process the requested change because the change forms were not signed by the beneficiary. (Doc. 1-13). Ms. Hughley faxed a properly signed form to TransAmerica on March 11, 2019. (Doc. 1-14).

The record indicates that Martie Jane Albert, the replacement primary beneficiary, is the sister of Melodie Hughley. (Doc. 12, pp. 1, 12; Doc. 12-10, p. 2). Ms. Albert bears no familial relation to Mrs. Pettersson, and the pertinent beneficiary designation form lists her as "friend." (Doc. 1-14, p. 3). Sarah Jane Hughley's relationship is also listed as "friend," and the record of this case does not otherwise indicate her relationship to Mrs. Pettersson or to Ms. Hughley.

Mrs. Pettersson died on May 5, 2019. Mr. Pettersson notified TransAmerica of her death by telephone, and also informed TransAmerica that he believed Ms. Hughley had fraudulently obtained the power of attorney over Mrs. Pettersson. (Doc. 1-16). Mr. Pettersson also corresponded with TransAmerica by email to contest the change of beneficiary. In one email, on May 30, 3019, he stated that his wife "would not agree to her death benefit being paid to a stranger." (Doc. 1-25, p. 2). Several friends also sent emails contesting the change. For example, on May 9, 2019, Marilyn Sharpe-Allen, who described herself as a friend of Mrs. Pettersson, stated that Mrs. Pettersson "was a good wife to her husband Berno Pettersson whom she loved very much. I am sure she would want her husband to receive her insurance benefits. After all, they were married for almost 50 years." (Doc. 1-21, p. 2). On July 5, 2019, Mr. Pettersson sent a letter to TransAmerica contending that the change of beneficiary by the attorney-in-fact was a breach of fiduciary duty and asking, "How could the beneficiary be changed to someone unknown to the insured and who is not a relative, and still comply with the best interest of the principal's wishes?" (Doc. 1-29).

In response to the dispute between Mr. Pettersson and Ms. Albert, in June 2019, the insurance company suggested that Mr. Pettersson and Ms. Albert should confer to consider reaching an agreement. (Docs. 1-26, 1-27). Albert responded by filing a complaint with the Georgia Insurance Commissioner in July 2019. (Doc. 1-30, p. 2). Soon thereafter, the insurance company commenced this interpleader action.

## ANALYSIS

Both parties in this case are proceeding *pro se*, and neither has advanced a coherent legal argument. Ms. Albert, citing Georgia statutes governing the authority of an agent acting under power of attorney, argues that Ms. Hughley had the authority to make the contested change of beneficiary. Mr. Pettersson's response to the motion for summary judgment is particularly

incoherent but can be read to argue that the power of attorney was obtained by undue influence and that Ms. Hughley breached her fiduciary duty under the power of attorney by naming her own sister as beneficiary of Mrs. Pettersson's life insurance policy. The Court's review of the evidence in this case, set forth above, shows that there are genuine issues of material fact as to both of these arguments.

### A.   Authority of Agent under Power of Attorney

Claimant Albert argues that Melody Hughley acted pursuant to a valid power of attorney when she changed the beneficiary designation of the life insurance policy at issue from Mr. Pettersson to her sister, Ms. Albert. To be valid under Georgia law, a power of attorney form must be signed by the principal, attested by a competent witness not also named as agent, and attested by an authorized officer — typically a notary — not also named as agent. O.C.G.A. § 10-6B-5(a). The power of attorney obtained by Ms. Hughley facially meets these requirements. *See* (Doc. 1-2, p. 8). The form bears Mrs. Pettersson's signature, the form is notarized by attorney Jennifer Haskins, and the form bears the signatures of two witnesses. Mr. Pettersson reads the names of the witnesses as Grace Groves and Donald Cleveland and asserts they were Mrs. Petterson's caregivers, (Doc. 35, p. 5), and Albert offers no different reading. *See* (Doc. 36, p. 8, ¶ 12k).

Georgia law authorizes an agent acting under power of authority to "create or change a beneficiary designation" only if the power of attorney "expressly grants the agent the authority and exercise of the authority is not otherwise prohibited by another agreement or instrument to which the authority or property is subject." O.C.G.A. § 10-6B-40(a)(1)(D). The text of the power of attorney instrument authorized Ms. Hughley to "perform an act, power, duty, right, or obligation, in regard to any contract of life … insurance, and to … designate the beneficiary of

same[.]" (Doc. 1-2, p. 5, ¶ 9). The instrument further provided that the agent "cannot designate himself or herself as beneficiary of any such insurance contracts." (*Id.*).

Georgia law requires an agent acting under power of attorney to "[a]ct so as not to create a conflict of interest that impairs the agent's ability to act impartially in the principal's best interest." O.C.G.A. § 10-6B-14(b)(2). In the acceptance of appointment attached to the power of attorney instrument, Ms. Hughley agrees that she owes "a duty of loyalty and good faith to the Principal, and must use the powers granted … only for the benefit of the Principal." (Doc. 1-2 at p. 9).

### B.  Breach of Fiduciary Duty

The record of evidence in this case raises concerns about whether Ms. Hughley's naming of her own sister as the irrevocable beneficiary of Mrs. Pettersson's life insurance policy was for the benefit of Mrs. Pettersson or was in fact self-dealing on the part of Ms. Hughley. Mr. Pettersson states that Ms. Albert was nothing more than a passing acquaintance whom he and Mrs. Pettersson met only once, in 2005, at a rest stop in Florida. (Doc. 35, p. 5). There is little in the record to indicate that Ms. Albert's relationship to Mrs. Pettersson was any closer than Mr. Pettersson suggests. At most, Ms. Albert has submitted a letter that Ms. Hughley wrote to Ms. Albert on January 29, 2019, requesting Ms. Albert's signature on the change of beneficiary form, in which Ms. Hughley explains to her sister the reason for naming her as beneficiary:

> In the event of Jean's death, you are named as IRREVOCABLE 100% beneficiary. It was not the original request when I first sent it to the insurance company, as Stephenie to also be named, but she is not wishing to be involved – she knows Berno hates her, even though she is his only sister and surviving family member. ... Since neither you nor Stephenie are local, and Stephanie preferred to NOT deal with Berno, and because the form is not very clear in its instructions, I decided to pare down from 2 beneficiaries to just one – you. Jean loved you and she always asked about you. Since she and her only sister, Jimmie (who has been deceased for

about 10 years now), were never close, she was always a little envious of my close relationship with you. She appreciates you for doing this, just as she appreciated and cherished the things you sent her.

(Doc. 12-10, p. 2).

To the extent that it is admissible and credible, this letter is consistent with Mr. Pettersson's representation that Ms. Albert was no more than an acquaintance. Ms. Hughley indicates that Ms. Pettersson's only contact with Ms. Albert was indirect, merely that she sometimes "asked about" Ms. Albert when talking to Ms. Hughley and that she envied the relationship Ms. Hughley had with her sister in Tennessee. Nothing in this letter, or anywhere else in the record, provides a credible explanation for Mrs. Pettersson transferring her life insurance benefits from her husband of 43 years to the sister of a friend.

Throughout her statement, Ms. Hughley suggests that Mrs. Pettersson wanted to remove her husband from the life insurance policy because he was "demented," "crazy," and possibly abusive. Even if these allegations are accepted as true, they do not explain why Mrs. Pettersson would not have named one of her family members as beneficiary. The record indicates that Mrs. Pettersson has two surviving brothers. (Doc. 12-11, p. 19). Ms. Hughley states that Mrs. Petterson spoke with her younger brother, James Burgess, on the phone while in the nursing home and that Mrs. Pettersson "cried when she related to me how Berno took her brother off her life insurance as a beneficiary and placed himself and his sister instead." (Doc. 12-11, p. 20). The record also indicates that Mr. Pettersson has a surviving sister, Stephenie P. Barrett, who was originally named as the contingent beneficiary of Mrs. Pettersson's life insurance policy. (Doc. 1-1, p. 20). In the letter referenced above, Ms. Hughley stated that Mr. Petterson "hates" his sister, and in her statement Ms. Hughley states that Ms. Barrett "had no desire to be involved with" her brother. (Doc. 12-11, p. 11). Again, even if these allegations are accepted as true, they do not explain why

Mrs. Pettersson would choose to remove her sister-in-law from the policy and name the sister of her agent instead.

Based on these contradictions, a reasonable finder of fact could conclude that Ms. Hughley decided to name her own sister as beneficiary of the life insurance only because the power of attorney did not allow her to name herself as beneficiary. A reasonable finder of fact could further conclude that the change of beneficiary was the result of a conflict of interest that impaired Ms. Hughley's ability to act impartially in the principal's best interest. *See Jonas v. Jonas*, 280 Ga. App. 155, 160-61 (2006).

### C.     Undue Influence

The record further presents genuine issues of material fact as to whether the power of attorney was obtained pursuant to undue influence. "Undue influence which overturns an otherwise legal contract is the exercise of sufficient control over the person, the validity of whose act is brought into question, to destroy his free agency and constrain him to do what he would not have done if such control had not been exercised." *Tidwell v. Critz*, 248 Ga. 201, 206 (1981) (quoting *Burroughs v. Reed*, 150 Ga. 724, 725 (1920)). The exercise of undue influence

> may be inferred in all cases of a confidential or quasi confidential relationship where the power of the person receiving a gift or other benefit has been so exerted upon the mind of the donor as, by improper acts or circumvention, to have induced him to confer the benefits contrary to his deliberate judgment, reason, and discretion. In order to render a transaction void, it must operate to deprive the donor of his free agency by substituting for his will that of another. Ordinarily undue influence is not the subject of direct proof, but is to be inferred from circumstances. Therefore a great latitude of proof is allowed in order to determine if a legal inference of undue influence may be present, and the evidence may embrace all the facts and circumstances which go to make up the transaction, disclose its true

15

character, and explain the acts of the parties in order to throw light on their objects and intentions.

*Scurry v. Cook*, 206 Ga. 876, 878 (1950)(citations omitted).

Georgia law related to undue influence was well summarized by a district judge in the Northern District of Georgia in an unreported case with similar facts to this case, *Jackson National Life Ins. Co. v. Hutchinson*, Case No. 1:13-cv-1653-ELR, 2015 WL 11198934, *11 (Aug. 18, 2015, N.D.Ga.):

> Undue influence is "the exercise of sufficient control over the person, the validity of whose act is brought in question, to destroy his free agency and constrain him to do what he would not have done if such control had not been exercised." [*Wheeless v. Gelzer,* 780 F. Supp. 1373, 1383 (N.D.Ga. 1991) (quoting *Burroughs v. Reed*, 150 Ga.724, (1920)) (internal quotation marks omitted)]. Notably, undue influence is typically a question for the finder of fact and may be shown by both circumstantial and direct evidence. [*Mathis v. Hammond*, 268 Ga. 158, 160 (1997)].
>
> As is relevant here, undue influence may be inferred from a confidential relationship or a disparity between the mental capacities of the parties. *Trs. of Jesse Parker Williams Hosp. v. Nisbet*, 191 Ga. 821, 14 S.E.2d 64, 75 (1941). Once the party arguing undue influence establishes that such an inference is appropriate, the burden shifts to the other party to show the absence of undue influence.

The record of this case presents substantial evidence from which a reasonable finder of fact could conclude that Ms. Hughley obtained the power of attorney from Mrs. Pettersson in an exercise of undue influence. First, there is evidence of a confidential relationship between Ms. Hughley and Mrs. Pettersson. From the evidence outlined above, a finder of fact could infer that Ms. Hughley essentially took complete control of Mrs. Pettersson's affairs once Mr. Pettersson was admitted to the hospital. Ms. Hughley's statement makes clear that she considered herself the

principal caregiver for Mrs. Pettersson while she was confined in a nursing home. She made efforts to supervise Mrs. Pettersson's finances, including attempts to obtain Medicaid coverage for her treatment. (Doc. 12-11, p. 12). As soon as Mr. Pettersson was hospitalized, Ms. Hughley and her husband went to the Petterssons' home and cleaned it and went through the mail. (Doc. 12-11, pp. 6-7). The Hughleys essentially maintained custody of the Pettersson home throughout Mr. Pettersson's hospitalization, and on one occasion took possession of Mr. Pettersson's personal property, including laptop computers, tablet computers, personal papers, and a firearm. (Doc. 12-11, p. 12). Ms. Hughley considered herself a "fellow guardian of those items" because of her former employment by Mr. Pettersson. (*Id.*). Ms. Hughley changed Mrs. Pettersson's mailing address to a new Post Office box, at least part in an effort to limit Mr. Pettersson's access to correspondence related to Mrs. Pettersson's care. (Doc. 12-11, p. 17). In her correspondence with TransAmerica, Ms. Hughley repeatedly demanded that the insurance company not communicate with Mr. Pettersson. In addition to taking control of Mrs. Pettersson's mail, Ms. Hughley took control of her telephone use as well, attempting to limit her communications with her husband and supervising her communications with other family members. (Doc. 12-11, pp. 10, 19-20). She blocked incoming calls from Mr. Pettersson and blocked Mrs. Pettersson's access to voice mail. (Doc. 12-11, pp. 10, 19). At one point she took away the flip-phone she had obtained for Mrs. Pettersson and only allowed Mrs. Pettersson to make calls to her brother on Ms. Hughley's phone. (*Id.*). Ms. Hughley also made efforts to obtain a power of attorney or guardianship over Mr. Pettersson but was unsuccessful. (Doc. 12-11, p. 11).

  A finder of fact could also infer that there was a disparity between the mental capacities of the parties. Mrs. Pettersson's mental capacity is not entirely clear from the record. It is clear that she was 76 years old, in a nursing home, bed-ridden, and receiving regular dialysis. It is also

apparent from Ms. Hughley's statement that Mrs. Pettersson was unable to supervise her own personal and financial affairs and even unable to manage use of a telephone without supervision. Mrs. Hughley makes clear that she was managing most of Mrs. Pettersson's day to day affairs during the time Mrs. Pettersson was in the nursing home, at least after Mr. Pettersson was hospitalized.

The above evidence of a confidential relationship and of a disparity between the mental capacities of the parties is sufficient to give rise to an inference that Ms. Hughley acted with undue influence in obtaining the power of attorney over Mrs. Pettersson. Ms. Albert has introduced some evidence to rebut this inference, primarily in the form of Ms. Hughley's representations about Mrs. Pettersson's wishes. In addition, correspondence from the attorney who drafted the power of attorney suggests that the attorney considered Mrs. Pettersson to be of sound mind at the time she signed the power of attorney. This evidence is sufficient to establish a genuine issue of material fact but is not sufficient to warrant judgment as a matter of law. The question of undue influence, with the question of breach of fiduciary duty, will require resolution at trial.

## TRIAL

Because neither party has properly served and filed a demand for jury trial under Rule 38 of the Federal Rules of Civil Procedure, this case will be tried before the Court. A pretrial conference will be held on November 17, 2021, at 10:00 a.m., in Courtroom E of the William Augustus Bootle Federal Courthouse, Macon, Georgia.

**SO ORDERED**, this 23rd day of September, 2021.

                                            s/ Charles H. Weigle
                                            Charles H. Weigle
                                            United States Magistrate Judge